J-A02010-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: A.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: D.M., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 665 WDA 2021 |

Appeal from the Order Dated April 29, 2021
In the Court of Common Pleas of Blair County Civil Division at No(s):
CP-07-DP-0000042-2019

BEFORE:     OLSON, J., MURRAY, J., and PELLEGRINI, J.[*]

MEMORANDUM BY OLSON, J.:                    **FILED: MARCH 25, 2022**

Appellant, D.M. ("Mother"), appeals the order entered on April 29, 2021, which found Mother to be a perpetrator of child abuse against A.M. ("Child," DOB 9/04) through her failure to act.[1]  After careful review, we affirm.

On August 6, 2019, Blair County Children, Youth, and Families ("BCCYF" or the "Agency"), received a report stating that Child was being sexually, physically, and emotionally abused by Stepfather.  The trial court granted immediate emergency protective custody to BCCYF.  After a hearing on August

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] Additionally, the April 29, 2021 order found that Mother's husband, C.M. ("Stepfather"), was a perpetrator of child abuse against Child.  Stepfather also appealed the April 29, 2021 order, but his appeal is docketed separately from the instant matter.

19, 2019, the trial court adjudicated Child dependent on August 27, 2019. *See* Trial Court Order, 8/27/19. The trial court also found aggravated circumstances against Mother. *See* Trial Court Order, 2/19/20.[2]

In the meantime, BCCYF conducted an investigation and indicated Stepfather and Mother as perpetrators of abuse on October 4, 2019.[3] *See* Permanency Review Order, 8/6/20, at 6. BCCYF subsequently filed a petition for a finding of child abuse on November 4, 2020, naming both Mother and Stepfather as alleged perpetrators, and requesting to change the "indicated" status to a "founded" claim of abuse. *See* BCCYF Petition for Finding of Child Abuse, 11/10/20, at 3 (unpaginated). The trial court held an evidentiary hearing on the petition on November 10, 2020. Present at the hearing was BCCYF's counsel, Danielle Donivan, Esquire; Mother and her appointed counsel, Matthew McGregor, Esquire; Child and Child's guardian *ad litem*

---

[2] Mother did not appeal the dependency or aggravated circumstances determination.

[3] Stepfather's administrative appeal to the Department of Human Services Bureau of Hearings and Appeals was denied on January 23, 2020. Thereafter, Stepfather requested a hearing, but such proceedings have been stayed pending the conclusion of the instant dependency proceedings. *See* Permanency Review Order, 8/6/20, at 6. Mother similarly filed an administrative appeal which was denied on April 16, 2020; however, Mother did not request a subsequent hearing on her appeal. *Id.*

("GAL"), Mary Ann Probst, Esquire; counsel for Child's Biological Father, P.M. ("Biological Father"), Matthew Dombrosky, Esquire;[4] and Stepfather.[5]

Child testified to three separate interactions involving Stepfather. She explained that the first incident happened while the family was living in Juniata, Pennsylvania when Child was ten years old. N.T. Abuse Hearing, 11/10/20, at 11, 21. While Mother was at the hospital for a hysterectomy, Stepfather woke Child in the middle of the night and told Child to sleep in his room. *Id.* Child explained, "I thought he was going to go downstairs and he actually came into the bedroom and slept in the bed also[,] and he started to rub my back and then he had his hands down my pants and into my vagina." *Id.* This incident lasted "until he went to the bathroom and I ran and hid under my blankets in my bed." *Id.* Child testified that she told Stepfather to stop, but he ignored her. *Id.* at 12. Child further testified that she told Mother about this incident a few days later, but Mother "looked at me and said [']aren't you sure it wasn't a dream.[']" *Id.* Child responded no, however

_____

[4] In a criminal sentencing order for a case unrelated to the proceedings *sub judice*, the trial court incarcerated Child's Biological Father, P.M., for child sexual offenses and precluded him from attending hearings or obtaining information in relation to Child. Nevertheless, counsel for Child's Biological Father represented the interests of Child's Biological Father in the November 10, 2020 proceeding in his absence. Thereafter, Child's Biological Father signed a consent to voluntarily terminate his parental rights to Child. Accordingly, Child's Biological Father is not a party to this appeal.

[5] Stepfather elected to proceed without an attorney. *See* N.T. Abuse Hearing, 11/10/20, at 2-3.

- 3 -

"then I felt like [] I was being accused of lying so I just went with it and said maybe it was a dream, after I had said no." *Id.* at 13.

The second incident to which Child testified happened when the family lived in Sinking Valley, Pennsylvania and Child was 12. *Id.* at 23. While Mother was sleeping, Stepfather came into Child's room, grabbed her, and told her to kiss him. *Id.* at 13. Child testified that she said no, backed away, and hid under the blankets. *Id.* When Child exited the room to play outside with her brother, Stepfather grabbed her buttocks. *Id.* Child testified that she reported this when Mother awoke, but Mother "just left it go again." *Id.* at 13-14.

Child testified that the third incident occurred during the summer prior to seventh grade while she was alone with Stepfather as he was driving his work truck. *Id.* at 14, 24. Stepfather put a five dollar bill down Child's pants and a ten dollar bill in her bra while inappropriately touching her in both places, rubbing and touching both inside and outside of her body. *Id.* at 14-15. Child told Stepfather to stop but could not otherwise leave the moving vehicle. *Id.* at 15. Child testified that Stepfather then pulled his penis through the hole of his pants and grabbed her hand to touch his penis while stating "come on, you know you like it." *Id.* at 15-16. Child said no and pulled her hand back without touching him. *Id.* at 16. Stepfather then offered to pay Child 20 dollars to have sexual intercourse with him, saying, "we won't tell your mom and we'll just tell her we're late." *Id.* at 16-17. When Child denied

Stepfather, he threatened that if she did not kiss him, he would tell Mother. *Id.* at 17. Child testified that she responded, "go right ahead, maybe she will believe me," and explained she was referencing Mother calling her a liar or denying her accusations every time Child disclosed the incidents. *Id.* at 17-18.

Child testified that she reported this incident to her Mother directly after getting out of the truck with Stepfather. *Id.* at 18. Mother immediately called Child a liar. *Id.* Once they returned home, Mother called Child a "slut" and asked where the money was. *Id.* Child testified that Mother never believed her disclosures: "No, she has always called me a liar or tried to convince me that it did not happen." *Id.* Child further explained that despite each report to her Mother, Mother never took steps to protect her from Stepfather; instead, "all things remained the same," and Child was "still left under [Stepfather's] watch." *Id.* at 21.

Next, BCCYF caseworker, Kendra Wheelden, testified. Ms. Wheelden conducted the child abuse investigation after Child's removal from the home on August 6, 2019. *Id.* at 33. She attended Child's forensic interview at the Child Advocate Center on August 7, 2019, and met with Child a few times at her foster home. *Id.* at 34. Ms. Wheelden testified that Child's testimony at the hearing was consistent with her disclosures at the interview and throughout Ms. Wheelden's investigation. *Id.* Her investigation included Child's interview, and interviews with Mother and Stepfather, where the

conversation "really was not very productive" because Mother was yelling and screaming, or else refused to talk with caseworkers.[6]  *Id.* at 34-35.  The evidence Ms. Wheelden relied upon during her investigation included the following:

> [The e]vidence was [Child's] consistent story.  Across multiple times her story did not change with what happened.  There was an active criminal investigation as well.  That is still pending.  There was also a journal that [Child] spoke about writing down accounts of what had happened and [Altoona Police Department] was able to secure that and confirm that it existed[. T]here were details listed in the journal as well.  So with all of that[,] we were able to say that we could indicate[] that for child abuse.

*Id.* at 35.

Ms. Wheelden testified that on October 4, 2019, the investigation concluded and the case was marked "indicated."  *Id.* at 38.  Regarding Stepfather, all of the indications were for sexual abuse of a child "by commission for aggravated indecent assault, indecent assault, indecent exposure, unlawful contact with a minor, and influencing, using, persuading, enticing or inducing a child to engage in or assist another individual."  *Id.* at 35-36.  Mother was indicated "for omission because we were able to determine through [Child's] stories that she had told her mother multiple times about

_____

[6] At a prior shelter care hearing, Ms. Wheelden testified that upon addressing the allegations with Mother and Stepfather, Mother "got very hostile and threw a fan at the caseworker," claimed the allegations were untrue, requested Child be placed out of the home, and "the only thing that they would allow the caseworker to take was [Child's] medication; not any clothing or anything else."  N.T. Shelter Care Hearing, 8/9/19, at 3, 5.

the abuse. [Mother] did not do anything to protect her and the abuse continued to occur." *Id.* at 36. Thus, Mother was indicated for omissions for the same categories as Stepfather: aggravated indecent assault, indecent assault, indecent exposure, unlawful contact with a minor, and influencing, using, persuading, inducing, or enticing a child to engage in or assist another individual. *Id.* at 37.

When asked if Mother ever explained the basis for her disbelief, Ms. Wheelden testified that Mother stated "that [Child] was disobedient. She had said that [Child] lies. She indicated that [Child] had very poor hygiene and was dirty[,] so [Stepfather] would not want to touch her[. S]he also indicated that [Stepfather] does not even touch [Mother] so he would not be touching her daughter." *Id.* at 36-37. Ms. Wheelden testified that she did not believe Mother's explanations were credible. *Id.* at 37.

Lastly, Ms. Wheelden explained that she did not have Child evaluated by a doctor during her investigation because "when sexual abuse is reported[,] there's a [72] hour window from when evidence can be collected[. S]he was not indicating that anything had happened in recent weeks to indicate the need to be seen [by] a doctor." *Id.* at 40-41.

After BCCYF rested, the trial court offered Mother and Stepfather the opportunity to testify or present witnesses and evidence. *Id.* at 44-47. Mother declined. *Id.* at 44. Stepfather briefly testified that Child has made different allegations against him "eighteen, twenty times" in the past, and

- 7 -

stated "I didn't do it." *Id.* at 46. Despite insinuating the existence of potential witnesses, Stepfather declined to present any other testimony or evidence. *Id.* at 46-48. The trial court then closed the evidentiary record after again verifying that no party desired to present further testimony or evidence. *Id.* at 48.

After the hearing, the trial court directed BCCYF, and offered all other parties the opportunity, to file proposed findings of fact and conclusions of law. *See* Trial Court Order, 12/9/20; Trial Court Order, 3/31/21. BCCYF timely complied. Stepfather filed an untimely memorandum of law on April 22, 2021. Mother did not file any memoranda.

On April 29, 2021, the trial court granted the petition for a finding of child abuse, changing Child's "indicated" abuse status to "founded" due to Stepfather's affirmative actions and Mother's failure to act, "which caused [Child] to suffer sexual abuse, more specifically, aggravated indecent assault; causing sexual abuse to children by employing, using, persuading, inducing, enticing; indecent assault, indecent exposure; and unlawful contact with a minor." Trial Court Opinion, 4/29/21. This appeal followed.[7]

_____

[7] Mother filed a notice of appeal on June 1, 2021. Although Mother failed to contemporaneously file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 905(a)(2) and 1925(a)(2)(i), and failed to timely comply with a June 8, 2021 order to file a concise statement, we note that Mother eventually filed a concise statement on June 28, 2021, which the trial court then addressed in its Rule 1925(a) opinion. In light of Mother's eventual compliance, the lack of prejudice, and the substantial rights at stake, we

On appeal, Mother presents the following issues for our review:

1. Whether the trial court erred in relying upon a "substantial evidence" standard of proof[?].

2. Whether the trial court erred in finding that sufficient evidence existed to support a finding of abuse against [Mother?]

Mother's Brief at 4.

Preliminarily, we note that Mother failed to preserve her first claim, which challenges the evidentiary standard employed by the trial court, as she did not include it within her Rule 1925(b) concise statement. Consequently, Mother waived this claim. *See T.M.W. v. N.J.W.*, 227 A.3d 940, 947 (Pa. Super. 2020) (failure to include an issue in a Rule 1925(b) statement "waives that issue for purposes of appellate review."). Notwithstanding waiver, Mother's issue warrants no relief. Here, the trial court did not expressly reference the standard it employed in its order entered on April 29, 2021 or in its opinion issued on July 7, 2021. Therefore, we presume the court applied the proper legal standards. *See Commonwealth v. Hunter*, 554 A.2d 550, 558 (Pa. Super. 1989) (concluding that, where a trial court sits as fact-finder, "we will presume that the [trial] court applied proper legal

_____

decline to dismiss Mother's appeal. *See In re K.T.E.L.*, 983 A.2d 745, 747-748 (Pa. Super. 2009) (noting that the failure to file a contemporaneous concise statement with the notice of appeal "will result in a defective notice of appeal" where waiver will be decided on a case-by-case basis, and declining to find waiver where the appellant eventually complied and other parties were not prejudiced). The trial court complied with Pa.R.A.P. 1925(a).

standards."). Moreover, as discussed below, the trial court's determination is supported under the applicable clear and convincing evidentiary standard. [8]

Within her remaining claim, Mother asserts that there was insufficient evidence to support the trial court's finding of sexual abuse against Mother.

> We review a dependency court order for an abuse of discretion. We accept the trial court's credibility determinations and findings of fact so long as we find support for them in the record[, h]owever, we need not accept the [trial] court's inferences or conclusions of law.
>
> The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence. The admission of evidence is within the purview of the trial court's discretion.
>
> While dependency proceedings are governed by the Juvenile Act, 42 Pa.C.S.A. §§ 6301-6375, the [Child Protective Services Law ("CPSL"), 23 Pa.C.S.A. §§ 6301-6387,] controls determinations regarding findings of child abuse, which the [trial court] must find by clear and convincing evidence. As the Supreme Court explained … "as part of a dependency adjudication, a [trial] court may find a parent to be the perpetrator of child abuse as defined by the CPSL."
>
> To justify a finding of child abuse under section 6303(b.1) of the CPSL, a court must determine, among other possibilities, that

---

[8] Within its filings with the trial and appellate courts, BCCYF appears to conflate the evidentiary standards governing agency decision-making and judicial adjudications. **Compare** 23 Pa.C.S.A. § 6303(a) (agency may administratively enter an "indicated report" of child abuse under a substantial evidence standard), and **J.F. v. Department of Human Services**, 245 A.3d 658, 667 (Pa. 2021) (noting that the standard of review for appeals from agency decisions is, *inter alia*, whether the findings of fact are supported by substantial evidence), with **Interest of J.M.**, 166 A.3d 408, 421-422 (Pa. Super. 2017) (determining that, though a finding of child abuse is not conditioned upon a finding of dependency, child abuse must still be proven by clear and convincing evidence in a judicial adjudication).

clear and convincing evidence supports a finding that a child was sexually abused, or put at risk of such abuse, through any failure to act.

*Interest of S.C.*, 230 A.3d 446, 450-451 (Pa. Super. 2020) (citations and quotations omitted; paragraphing edited). Clear and convincing evidence "requires that a finding be based on testimony by credible witnesses who clearly relate facts that are so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." *J.M.*, 166 A.3d at 427 (quotation omitted). While a finding of abuse must be supported by clear and convincing evidence, a trial court's "findings as to the identity of the abusers need only be established by *prima facie* evidence[.]" *Interest of H.Y.*, 233 A.3d 923, 928 (Pa. Super. 2020), *quoting In re C.R.S.*, 696 A.2d 840, 843 (Pa. Super. 1997).

A trial court may find child abuse where an individual causes sexual abuse or exploitation of a child through any act or failure to act, or creates a likelihood of sexual abuse or exploitation of a child through any act or failure to act. 23 Pa.C.S.A. §§ 6303(b.1)(4) and (6). The CPSL defines "sexual abuse or exploitation" as any of the following:

(1) The employment, use, persuasion, inducement, enticement or coercion of a child to engage in or assist another individual to engage in sexually explicit conduct, which includes, but is not limited to, the following:

(i) Looking at the sexual or other intimate parts of a child or another individual for the purpose of arousing or gratifying sexual desire in any individual.

- 11 -

(ii) Participating in sexually explicit conversation either in person, by telephone, by computer or by a computer-aided device for the purpose of sexual stimulation or gratification of any individual.

(iii) Actual or simulated sexual activity or nudity for the purpose of sexual stimulation or gratification of any individual.

(iv) Actual or simulated sexual activity for the purpose of producing visual depiction, including photographing, videotaping, computer depicting or filming.

This paragraph does not include consensual activities between a child who is 14 years of age or older and another person who is 14 years of age or older and whose age is within four years of the child's age.

23 Pa.C.S.A. § 6303(a)(1). Moreover, the definition includes offenses committed against a child, including, *inter alia*, aggravated indecent assault, indecent assault, indecent exposure, and unlawful contact with a minor, as those offenses are defined within the Crimes Code. 23 Pa.C.S.A. at § 6303(a)(2).

Mother argues that there was insufficient evidence to support the trial court's finding of child abuse against Mother because it relied solely upon Child's testimony. Mother's Brief at 8. In her view, the finding was improper because "the testimony represented a fairly strong mistrust between [Mother] and [Child]." *Id.* at 9. Thus, "[a]bsent any physical evidence of injury or trauma, or even external sources to corroborate the allegation," the trial court's "blind acceptance of [Child's] claims, through the lens of a relationship tainted by potentially well-rooted skepticism, could result in dire consequences." *Id.*

Here, the trial court credited Child's testimony "in all respects," and found her testimony sufficient to support its finding of child abuse. Trial Court Opinion, 7/7/21, at 3.

> Specifically, Child testified that Stepfather penetrated her vagina with his fingers on two separate occasions without her consent. Child also testified to other incidents where Stepfather requested that she kiss him and that he touched private areas of her body. Child also testified that Stepfather forced Child to grab his penis and attempted to elicit Child's consent to have sexual intercourse with him for money. In addition to the numerous credible allegations testified to by Child, she also testified that she informed Mother of each of the incidents. Mother brushed off the original incident as a dream and essentially blamed her for other incidents. Mother took no steps to inquire further into the allegations nor did she have any further conversations with Child to determine the exact facts. As a result, Child was subject to further abuse by Stepfather.

*Id.* at 3-4.[9]

After a careful review of the evidence, we find sufficient, clear and convincing evidence in the record for the trial court to reach its conclusions in the April 29, 2021 order. There was sufficient evidence from which the trial court could have properly concluded that Stepfather perpetrated sexual abuse upon Child, and that Mother was also a perpetrator of sexual abuse upon Child by creating the likelihood of sexual abuse or exploitation through her failure to act and protect Child pursuant to 23 Pa.C.S.A. §§ 6303(b.1)(4) and (6), despite Child's multiple disclosures. Child testified about three separate

---

[9] To protect the identities of Child and the parties, we replaced their names with "Stepfather," "Mother," and "Child" within the trial court opinion.

incidents whereby Stepfather penetrated her vagina with his fingers, fondled her breasts, directed that she kiss him, grabbed her buttocks, and solicited sexual intercourse for money. Child testified that she disclosed these incidents to Mother, however Mother brushed off Child's statements as bad dreams or lies, called Child a slut, and demanded further proof. With each incident, Mother's failure to investigate Child's allegations or create a separation between Child and Stepfather created a likelihood that Child would suffer further sexual abuse or exploitation by Stepfather. Ms. Wheelden testified that Child's allegations and version of events remained consistent throughout the BCCYF child abuse investigation and in her testimony at trial. Therefore, the record supports the trial court's findings.

Mother's argument that the trial court erred in relying solely upon Child's testimony is unavailing. Pennsylvania law is clear that a victim's uncorroborated testimony to sexual offenses committed upon her is sufficient in-and-of itself. *See*, *e.g.*, *Commonwealth v. Trippett*, 932 A.2d 188, 201 (Pa. Super. 2007) ("the uncorroborated testimony of a sexual assault victim, if believed by the trier of fact, is sufficient to convict a defendant"). The trial court found Child credible, and we will not upset this finding on appeal. *Interest of L.V.*, 209 A.3d 399, 314 (Pa. Super. 2019) ("We are required to defer to a trial court's credibility findings if they are supported by the evidence."). Moreover, the record belies Mother's assertion that the testimony demonstrates her "fairly strong mistrust" of Child through "well-rooted

skepticism." The credited testimony revealed Mother's disregard for, and careless rejection of, Child's disclosures without any personal investigation. Mother declined to present any evidence at the hearing to dispute the allegations in BCCYF's petition or Child's testimony. Instead, Mother was noncompliant and even combative during BCCYF's investigation.

After careful review, we conclude that the trial court did not abuse its discretion in finding that Mother perpetrated child abuse against Child, specifically sexual abuse or exploitation, through her acts or failure to act. Accordingly, we affirm the April 29, 2021 order.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date:  3/25/2022